Filed:  July 26, 2000

UNITED STATES COURT OF APPEALS

FOR THE FOURTH CIRCUIT

No. 98-1332
(CA-97-2672-6-13)


Norfolk Southern Railway Company,

Plaintiff - Appellant,

versus

Brotherhood of Locomotive Engineers, et al.,

Defendants - Appellees.


O R D E R


The court amends its opinion filed June 22, 2000, as follows:

On page 11, second full paragraph, line 3 -- the comma after the word "management" is deleted.

For the Court - By Direction


/s/ Patricia S. Connor
Clerk

**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

NORFOLK SOUTHERN RAILWAY
COMPANY,
<u>Plaintiff-Appellant,</u>

v.

BROTHERHOOD OF LOCOMOTIVE
ENGINEERS; CLARENCE V. MONIN,
Individually and as Brotherhood of
Locomotive Engineers President;
P. T. SORROW, Individually and as
Brotherhood of Locomotive
Engineers Vice President; EDWARD
DUBROSKI, Individually and as
Brotherhood of Locomotive
Engineers First Vice President;
RUSSELL W. BENNETT, Individually

and as Brotherhood of Locomotive
Engineers Secretary/Treasurer; R. C.
WALLACE, Individually and as
Brotherhood of Locomotive
Engineers General Chairman;
AMERICAN TRAIN DISPATCHERS
DEPARTMENT - BLE; LES A.
PARMELEE, Individually and as
American Train Dispatchers
Department - BLE President;
WILLIAM A. CLIFFORD, Individually
and as American Train Dispatchers
Department - BLE Vice President;
JAMES A. PARKER, Individually and
as American Train Dispatchers
Department - BLE Vice President;

No. 98-1332

DAVID W. VOLZ, Individually and as
American Train Dispatchers
Department - BLE Vice President
(West); F. LEO MCCANN,
Individually and as American Train
Dispatchers Department
Secretary/Treasurer; S. A.
HUNNICUTT, Individually and as
American Train Dispatchers
Department General Chairman;
E. A. LANHAM, JR., Individually and
as American Train Dispatchers
Department Office Chairman;
C. W. HENDRICKS, Individually and
as American Train Dispatchers
Department Office Chairman;
T. E. RUSSELL, Individually and as
American Train Dispatchers
Department Office Chairman;
M. G. GIDEON, Individually and as
American Train Dispatchers
Department Office Chairman;
W. L. MOSLEY, Individually and as
American Train Dispatchers
Department Office Chairman,
Defendants-Appellees.

Appeal from the United States District Court
for the District of South Carolina, at Greenville.
G. Ross Anderson, Jr., District Judge.
(CA-97-2672-6-13)

Argued: March 4, 1999

Decided: June 22, 2000

Before WIDENER, LUTTIG, and MICHAEL, Circuit Judges.

_____

2

Affirmed by published opinion. Judge Michael wrote the opinion, in which Judge Luttig joined. Judge Widener wrote a separate concurring opinion.

_____

**COUNSEL**

**ARGUED:** Jeffrey Stephen Berlin, SIDLEY & AUSTIN, Washington, D.C., for Appellant. Michael Stephen Wolly, ZWERDLING, PAUL, LEIBIG, KAHN, THOMPSON & WOLLY, P.C., Washington, D.C., for Appellees. **ON BRIEF:** Mark E. Martin, Edward R. McNicholas, SIDLEY & AUSTIN, Washington, D.C.; Mark D. Perreault, Roanoke, Virginia; Frank H. Gibbes, III, Deborah Casey Brown, GIBBES, GALLIVAN, WHITE & BOYD, P.A., Greenville, South Carolina, for Appellant. Daniel G. Orfield, ZWERDLING, PAUL, LEIBIG, KAHN, THOMPSON & WOLLY, P.C., Washington, D.C.; Harold A. Ross, ROSS & KRAUSHAAR CO., L.P.A., Cleveland, Ohio, for Appellees.

_____

**OPINION**

MICHAEL, Circuit Judge:

The question in this appeal is whether there is an implied remedy under the Railway Labor Act, 45 U.S.C. §§ 151-188 (the RLA or the Act), for damages caused by a union strike over what is known as a "minor dispute." We hold that a damages remedy is not available in this circumstance.

I.

This case arises out of a five-hour strike called on September 3, 1997, by the American Train Dispatchers Department of the Brotherhood of Locomotive Engineers (the union) against the Norfolk Southern Railway Company (the railroad). For several years prior to the strike, the union and the railroad had been at odds over one aspect of the railroad's work assignment authority under the collective bargaining agreement. Specifically, the parties disagreed about whether the

3

railroad could assign a dispatcher to work a shift or "desk" other than his regular one. (In a train dispatchers' office each "desk" governs a particular region of the railroad's operations.) On August 25, 1997, Harry G. Shirley reported for duty at the railroad's Birmingham, Alabama, train dispatching office to work at his regular desk. When a supervisor directed him to work "off assignment," that is, at another desk in the same office, Shirley said he was too sick to work at the other desk. Despite warnings from the chief dispatcher and the superintendent, Shirley marked off sick and left the office. A week later, on September 2, 1997, the railroad issued a "notice of charge" to Shirley for insubordination and marking off sick under false pretenses. The union called a strike in response, and the dispatchers walked off the job at about 11:00 a.m. on September 3, 1997. The strike lasted five hours until a federal district judge in South Carolina entered a temporary restraining order directing the dispatchers to return to work.

On October 2, 1997, the district court issued a preliminary injunction prohibiting the strike, concluding that the union had struck the railroad "over a minor dispute, in violation of the commands of the Railway Labor Act." The railroad then filed an amended complaint that added a claim against the union for damages caused by the strike. The railroad asserted damages of approximately $250,000 for, among other things, the payment of overtime wages, the payment of wages to employees who were not productive on the day of the strike, and costs associated with the delay of freight trains. On the union's motion under Fed. R. Civ. P. 12(b)(6) the district court dismissed the railroad's claim for damages, holding that a damages remedy cannot be implied under the RLA when, as in this case, employees strike over a minor dispute. Final judgment was then entered, and the railroad appealed the dismissal of its claim for damages.

II.

Today's question -- whether a carrier has an implied RLA remedy for damages resulting from a union strike over a minor dispute -- is best answered with some history in mind. As the Supreme Court has said, "[t]he Railway Labor Act `cannot be appreciated apart from the environment out of which it came and the purposes which it was designed to serve.'" Burlington N. R.R., Co. v. Brotherhood of Main-

4

tenance of Way Employees, 481 U.S. 429, 444 (1987) (quoting Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 751 (1945) (Frankfurter, J., dissenting)). History and experience, in other words, dictated the purpose and structure of the RLA, as passed in 1926 and amended in 1934.

Our history lesson begins with World War I, when the federal government took control of the country's railroads. During the war the railroads were operated under the authority of the U.S. Railroad Administration, an agency run by a Director General who was appointed by the President. The Director General and the rail unions entered into national agreements covering wages and working conditions. See Charles M. Rehmus, Evolution of Legislation Affecting Collective Bargaining in the Railroad and Airline Industries, in The Railway Labor Act at Fifty 1, 6 (Charles M. Rehmus ed., 1977). The unions gave a no-strike pledge for the duration of the war. See Frank N. Wilner, The Railway Labor Act & the Dilemma of Labor Relations 38 (1991). Adjustment boards with equal representation from management and labor (the Director General voted in case of a tie) decided grievances arising out of interpretation of the national agreements. See Jacob Seidenberg, Grievance Adjustment in the Railroad Industry, in The Railway Labor Act at Fifty, supra, at 209, 209-10. The Railroad Administration controlled wartime freight rates and passenger fares, and the government guaranteed the carriers a set rate of return. See Wilner, supra, at 39-40.

As World War I drew to a close, Congress became concerned about the potential for labor-management discord when the railroads were returned to private management and the unions were free to call strikes. The consensus in Congress was that continued (and substantial) government involvement in railroad labor relations would be necessary to preserve the peace in the rail industry. Thus came the Transportation Act of 1920. See Rehmus, supra, at 6.

To start off, the Transportation Act of 1920 restored possession of the railroads to their private owners. Title III of the act then imposed a comprehensive system for the resolution of rail labor disputes. First, Title III called upon carriers and labor organizations to create local adjustment boards to decide disputes that "involv[ed] only grievances, rules, or working conditions." Transportation Act of 1920, tit. III,

5

§ 303, 41 Stat. 456, 470 (repealed 1926). Second, and more important, Title III created a Railroad Labor Board (to be appointed by the President) that was empowered to decide all wage disputes and any dispute not dealt with by an adjustment board. See title III, §§ 304-307, 41 Stat. at 470-71. This dispute resolution scheme was characterized as "a form of compulsory arbitration," see International Ass'n of Machinists v. Street, 367 U.S. 740, 756-57 (1961), although the Railroad Labor Board could not seek judicial enforcement of its orders, see Pennsylvania R.R. Co. v. United States R.R. Labor Bd., 261 U.S. 72, 79 (1923). In any event, both labor and management believed that the 1920 act was seriously flawed because it failed to place primary reliance on collective bargaining and mediation, the means preferred by the parties for the resolution of their disputes. See Rehmus, supra, at 7.

Increasing dissatisfaction with the 1920 act, fueled in part by a national strike of 400,000 shopcraft workers in 1922, led representatives of rail labor and management to begin discussions aimed at formulating a joint proposal for legislation to replace the 1920 act. In January 1926, after months of negotiations, a bill worked out between labor and management was introduced in Congress. The bill -- publicly endorsed by both sides and enacted virtually without change -- became the Railway Labor Act of 1926. See Wilner, supra, at 44-47. The RLA of 1926, with some amendments, remains on the books today.

The RLA of 1926 relies first and foremost on collective bargaining for the settlement of labor-management disputes. Section 2 (Second) of the Act imposes a duty to bargain collectively in clear terms: "All disputes between a carrier and its employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated . . . by the carriers and by the employees." Railway Labor Act of 1926, § 2 Second, 44 Stat. 577, 578 (codified as amended at 45 U.S.C. § 152 Second). Although the 1926 RLA's structure for dispute resolution was (and is) in all instances bottomed on collective bargaining, the Act fashioned two tracks, one for dealing with minor disputes and one for major disputes. Minor disputes are those "arising out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions." Id. Major disputes are those"concerning changes in rates of

6

pay, rules, or working conditions." Id. Specifics aside, the Act set up machinery (available in both dispute categories) for mediation and voluntary arbitration. See id. §§ 3-9, 44 Stat. at 578-86.

The 1926 Act called for unsettled minor disputes to be referred to local (or regional) boards of adjustment. (This was an idea borrowed from the wartime experience and the 1920 act.) The carriers and employees were to set up these boards, and each side was to have equal representation. See id. § 3, 44 Stat. at 578-79 (codified as amended at 45 U.S.C. § 153). If an adjustment board could not reach a decision, either side could invoke the services of a permanent Board of Mediation, appointed by the President. Once the board was engaged, it was to "use its best efforts, by mediation, to bring [the parties] to agreement." Id. § 5, 44 Stat. at 580 (codified as amended at 45 U.S.C. § 155). Finally, if mediation failed, the RLA provided a structure for voluntary arbitration. See id. § 7, 44 Stat. at 582-84 (codified as amended at 45 U.S.C. § 157).

The 1926 RLA provided a new mechanism for dealing with major disputes, that is, disputes over potential changes to the collective bargaining agreement affecting rates of pay, rules, or working conditions. Any discussion of the Act's treatment of major disputes must begin with a brief note about a unique feature of labor agreements in the rail industry: the agreements usually do not have an expiration date; instead, they remain in effect, with either side calling for (and sometimes achieving) amendments from time to time. See William E. Thoms & Frank J. Dooley, Collective Bargaining Under the Railway Labor Act, 20 Transp. L.J. 275, 277 (1992).[1] The RLA of 1926 built on this custom, but it requires carriers and unions to give each other at least thirty days written notice of a proposed change in the agreement "affecting rates of pay, rules, or working conditions." Railway Labor Act of 1926, § 6, 44 Stat. at 582 (codified as amended at 45 U.S.C. § 156). This notice, called a "Section 6 notice" (after section 6 of the original Act), marks the beginning of the bargaining process for major disputes. If the dispute is not resolved in private conference between the parties, either side may call in the Board of Mediation (see above), and the board then tries to mediate a settlement. If the

_____

[1] The collective bargaining agreement in this case has been in effect, as amended, since 1949.

7

board fails, it attempts "to induce the parties to submit their [major dispute] to arbitration." Id. § 5. If there is no resolution in the end, each side is free to act in its own interests. In other words, the employees may strike, or the railroad may unilaterally implement its proposed change to the contract. See Wilner, supra, at 52. This process for dealing with major disputes has changed little in the 74 years since the Act's passage.

In 1934 Congress made several amendments to the Railway Labor Act. The amendments began with an extensive list of "general purposes" for the Act:

> (1) To avoid any interruption to commerce or to the operation of any carrier engaged therein; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.

Railway Labor Act of 1934, § 2, 48 Stat. 1185, 1186-87 (codified at 45 U.S.C. § 151a). Consistent with the new statement of purpose, the amendments added specific language about employees' rights to organize, declaring that "[n]o carrier, its officers or agents, shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice." Id. § 2 Fourth (codified at 45 U.S.C. § 152 Fourth). The amendments also made it illegal for a carrier to "contribut[e] to any labor organization, labor representative, or other agency of collective bargaining, or [to perform] work therefor." Id. Finally, and most important for this case, the 1934 amendments changed the Act's treatment of minor disputes.

In considering the 1934 amendments, Congress recognized that the original Act's local adjustment board system, which had been created

8

to deal with minor disputes, was flawed. In some places, labor and management forces were unable to agree on the composition of the local boards. See H.R. Rep. No. 73-1944, at 3 (1934). In others, the boards were established, but became hopelessly deadlocked once they began their work. See id.; see also Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co., 353 U.S. 30, 36 (1957). The 1934 amendments did not disturb the Act's reliance on collective bargaining as the first step in the process of minor dispute resolution. However, at the second step, local boards of adjustment were abolished. In their place, Congress established a National Railroad Adjustment Board, with four divisions, "making it unnecessary for parties to agree to establish their own boards." Id. at 36.[2] The new Adjustment Board divisions have equal representation from labor and management, and in case of deadlock the appropriate division can add a neutral referee to its ranks. See id. at 36-37. If the division cannot agree on a referee, one is appointed by the National Mediation Board.[3] Either side may submit a minor dispute to the Adjustment Board when negotiations fail. The relevant adjustment board division then has authority to decide the dispute: "The awards of the several divisions of the Adjustment Board . . . shall be final and binding upon both parties to the dispute." Railway Labor Act of 1934, § 3, 48 Stat. at 1191 (codified at 45 U.S.C. § 153). In devising this system,"Congress considered it essential to keep these so-called `minor' disputes within the Adjustment Board and out of the courts." Union Pacific R.R. Co. v. Sheehan, 439 U.S. 89, 94 (1978). Once the Adjustment Board has made an

_____

[2] If labor and management can agree to establish a local board of adjustment, the 1934 amendments give them this option. However, this option is bypassed if either party "elect[s] to come under the jurisdiction of the Adjustment Board." Railway Labor Act of 1934, § 3 Second, 48 Stat. at 1193 (codified as amended at 45 U.S.C.§ 153 Second).

[3] The 1934 amendments replaced the old Board of Mediation with the National Mediation Board. The amendments do not allow the parties to call the new mediation board into a minor dispute. See Chicago River, 353 U.S. at 37 n.14. The amendments, however, gave the new board continued authority to mediate major disputes. Finally, the 1934 amendments authorized the board to hear and decide representation disputes. See Railway Labor Act of 1934, §§ 2, 4-5, 48 Stat. at 1187-89, 1193-97 (codified as amended at 45 U.S.C. §§ 152, 154-155).

9

award, however, there is a provision for judicial enforcement. See 45 U.S.C. § 153 First (p).**4**

Although Congress, through the 1934 amendments, imposed a duty to arbitrate minor disputes before the Adjustment Board, the amendments did not provide a cause of action or remedy for a breach of this duty. The Supreme Court filled in the gap in Chicago River, making one remedy available. The specific question in Chicago River was whether a rail union could call a strike over a minor dispute pending before the Adjustment Board. See Chicago River , 353 U.S. at 31. The Court held that allowing such a strike "would render meaningless those provisions in the Act [the 1934 amendments] which allow one side to submit a dispute to the Board, whose decision shall be final and binding on both sides." Id. at 34 (emphasis omitted). The Act, in other words, requires the compulsory arbitration of minor disputes before the Adjustment Board, and strikes in that "limited field" are prohibited. See id. at 39.

The Court noted that its interpretation of the 1934 amendments was supported by the legislative history: "there was general understanding between both the supporters and the opponents of the 1934 amendment that the provisions dealing with the Adjustment Board were to be considered as compulsory arbitration." Id. at 39; see also Railway Labor Act Amendments: Hearings on H.R. 7650 Before the Comm. on Interstate and Foreign Commerce, 73d Cong. 47 (1934) (testimony of Joseph B. Eastman, Federal Coordinator of Transportation) (noting that unions had conceded the right to strike over minor disputes in

_____

**4** The Railway Labor Act has been amended several times since 1934. For example, subsequent amendments have brought airlines within the Act's jurisdiction, see Act of Apr. 10, 1936, ch. 166, 49 Stat. 1189 (codified at 45 U.S.C. §§ 181-188); authorized dues checkoff and union shop agreements, see Act of Jan. 10, 1951, 64 Stat. 1238 (codified at 45 U.S.C. § 152 Eleventh); and established special procedures for commuter rail disputes, see Omnibus Budget Reconciliation Act of 1981, Pub. L. No. 97-35, tit. XI, § 1157, 95 Stat. 357, 681-82 (codified at 45 U.S.C. § 159a). None of these amendments, however, has effected substantial changes to the Act's core sections. See Rehmus, supra, at 14 ("The 1934 amendments to the 1926 Act represent the last changes of major importance in the collective bargaining legislation affecting railroads . . . .").

return for the establishment of a national rail adjustment board); To Amend the Railway Labor Act: Hearings on S. 3266 Before the Comm. on Interstate Commerce, 73d Cong. 35 (1934) (testimony of George Harrison, spokesman for railway labor organizations) ("These railway labor organizations have always opposed compulsory determination of their controversies. . . . [W]e are now ready to concede that we can risk having our grievances to a board and get them determined . . .

Finally, with respect to remedy, the Supreme Court in Chicago River held that federal courts may enjoin rail strikes, notwithstanding the Norris-LaGuardia Act, 29 U.S.C. §§ 101-115, when those strikes are called in connection with minor disputes. See 353 U.S. at 40-42.

The background from World War I through Chicago River (1957) may be summarized as follows. The Railway Labor Act of 1926 was passed with the full support of labor and management in reaction to the heavy role the government had played in railroad labor relations beginning with World War I. The RLA of 1926 provided a dispute resolution structure that was bottomed on collective bargaining. The 1934 amendments kept this focus. To strengthen the process, however, Congress added compulsory arbitration for minor disputes if negotiations failed. Federal court involvement was to be minimal, although the Supreme Court in Chicago River held that strikes over minor disputes may be enjoined because the Act requires compulsory arbitration for these disputes. What remains an open question (at least in this circuit) is whether a carrier may file a lawsuit for damages when it claims injury as a result of a strike over a minor dispute. We turn to that question now.

III.

Although it did not say so directly, the Supreme Court in Chicago River recognized an implied right of action under the RLA to enforce the duty to arbitrate minor disputes. See Chicago River, 353 U.S. at 39-42. The Court held that the duty could be enforced through the implied remedy of injunctive relief (the strike over grievances was enjoined), see id., but it went no further in prescribing remedies. The Supreme Court has never said whether a damages remedy is available when the duty to arbitrate minor disputes is breached by a strike, but

11

the two circuits (the Fifth and Sixth) to decide the issue have held that damages are inappropriate in such a case. See CSX Transp., Inc. v. Marquar, 980 F.2d 359 (6th Cir. 1992); Burlington N. R.R. Co. v. Brotherhood of Maintenance of Way Employees, 961 F.2d 86 (5th Cir. 1992); Louisville & Nashville R.R. Co. v. Brown, 252 F.2d 149 (5th Cir. 1958).

Two Supreme Court cases of recent vintage, Franklin v. Gwinnett County Public Schools, 503 U.S. 60 (1992), and Gebser v. Lago Vista Independent School District, 524 U.S. 274 (1998), provide guidance for determining what remedies are available in a suit brought to enforce an implied right. In the first case, Franklin, the Supreme Court reiterated the traditional presumption "that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute." Franklin, 503 U.S. at 70-71. Franklin went on to say that in determining whether Congress intended for the presumption to apply when the cause of action is implied, "we evaluate the state of the law when the legislature passed" the statute. Id. at 71.

In the second case, Gebser, the Supreme Court reconfirmed the traditional presumption in favor of all appropriate relief, but the Court emphasized that it had "made no effort in Franklin to delimit the circumstances in which a damages remedy should lie." Gebser, 524 U.S. at 284. The Court then proceeded to set the limits of the presumption:

> Because the private right of action under [the statute] is judicially implied, we have a measure of latitude to shape a sensible remedial scheme that best comports with the statute. That endeavor inherently entails a degree of speculation, since it addresses an issue on which Congress has not specifically spoken. To guide the analysis, we generally examine the relevant statute to ensure that we do not fashion the parameters of an implied right in a manner at odds with the statutory structure and purpose.
>
> Those considerations, we think, are pertinent not only to the scope of the implied right, but also to the scope of the available remedies. We suggested as much in Franklin,

12

> where we recognized the general rule that all appropriate relief is available in an action brought to vindicate a federal right, but indicated that the rule must be reconciled with congressional purpose. The general rule, that is, yields where necessary to carry out the intent of Congress or to avoid frustrating the purposes of the statute involved.

Id. at 284-85 (citations and quotation marks omitted). The Gebser Court said finally that in situations where the cause of action is implied, "we attempt to infer how the . . . Congress [at the time of enactment] would have addressed the issue [of available remedies] had the action been included as an express provision in the statute." Id. at 285 (citations, quotation marks and alteration omitted). The Gebser Court conducted this exercise by looking at whether a damages remedy would "frustrate the purposes" of the statute. Id.

As we have indicated, when the RLA was passed in 1926 and amended in 1934, Congress did not specify any cause of action for breach of the duty to arbitrate minor disputes. Because an implied right of action was recognized in Chicago River, we presume that any appropriate remedy is available, unless the remedy (here, damages) runs counter to the purpose and structure of the Act. See Gebser, 524 U.S. at 284-85.

In part II we discussed the purpose and structure of the RLA (particularly with respect to minor dispute resolution), and we return to that topic to look for clues about what enforcement remedies are appropriate to carry out congressional intent. The overriding purpose of the RLA is to provide for the prompt and orderly settlement of all labor-management disputes in the rail industry and avoid interruption to commerce. See 45 U.S.C. § 151a. Thus, the primary duty that the Act imposes upon both labor and management is to "settle all disputes" so that rail service is not disrupted. 45 U.S.C. § 152 First. Moreover, the Act is designed to give each side relatively equal power in the bargaining process. To this end the RLA of 1926 guaranteed both sides independence in the selection of their bargaining representatives. See Railway Labor Act of 1926, § 2 Third, 44 Stat. 577, 578 (codified as amended at 45 U.S.C. § 152 Third). The organizational and bargaining rights of rail employees were made more specific in the 1934 amendments. Thus, (1) "[e]mployees shall have the

13

right to organize and bargain collectively," (2) "[t]he majority of any craft or class of employees shall have the right to determine who shall be [their] representative," and (3) "[n]o carrier . . . shall deny or in any way question the right of its employees to join, organize, or assist in organizing the labor organization of their choice." Railway Labor Act of 1934, § 2 Fourth, 48 Stat. 1185, 1187 (codified at 45 U.S.C. § 152 Fourth).

After establishing the duty to negotiate, and attempting to put the parties on equal footing, the RLA provides a structure for dispute resolution. First, the parties must attempt to settle their disputes by negotiation in a conference of their representatives. See 45 U.S.C. § 152 Sixth. Second, with respect to minor disputes, if one-on-one bargaining fails to bring about a settlement, either side may refer the dispute to compulsory arbitration before the Adjustment Board. See 45 U.S.C. § 153. The Act's scant reference to the courts makes clear that the dispute resolution process is to be carried out with a minimum of judicial involvement. See Union Pacific R.R. Co. v. Sheehan, 439 U.S. 89, 94 (1978).

The specific question for us is whether allowing damages for a strike over a minor dispute is consistent with the RLA's purpose and structure. We conclude that a damages remedy in this situation is at odds with the Act. In the RLA context, litigation about damages allegedly caused by a minor dispute strike would be a sideshow that detracts from the bargaining and arbitration required by the Act. The aim of the RLA is to channel the parties' efforts toward resolution of their labor disputes within the Act's carefully devised framework. See 45 U.S.C. § 151a. If we imply a statutory damages remedy in the case of minor dispute strikes, the parties will be drawn into contentious and time-consuming litigation in a separate venue when they should be devoting their energies to face-to-face bargaining or arbitration to resolve the underlying labor dispute. This result would be at cross purposes with the Act. In short, litigating about damages in a judicial forum would divert the parties' attention from the Act's comprehensive process for dispute resolution. The injunction remedy, on the other hand, is appropriate because it quickly returns the parties to the process provided in the Act: bargaining and (if necessary) arbitration to resolve a minor dispute. See Chicago River, 353 U.S. at 33-35. Today's case illustrates the point. The railroad moved swiftly under

14

the Act to obtain a temporary restraining order. As a result, the strike was over in five hours, and the union was forced to negotiate or arbitrate if it wished to press its grievance about desk assignments for dispatchers.

The railroad argues that regardless of whether a damages remedy under the RLA would help resolve a particular dispute, the availability of monetary relief would, in the long run, deter strikes over minor disputes. Any benefit this would bring is outweighed by other considerations. First, Congress, in enacting the RLA with labor-management consent, sought to strike a careful balance of power between the two sides as it devised a scheme to govern the resolution of disputes. See Marquar, 980 F.2d at 380-81. Handing the railroads a statutory damages club in strikes over minor disputes could upset that balance. After all, in the 74-year history of the RLA not one circuit court has held that damages are an appropriate remedy in this situation. We are hesitant after all these years to do anything that might upset the delicate balance, particularly since the Act is structured to keep judicial involvement at a minimum. Second, as the Supreme Court has recognized, "distinguishing between major disputes and minor disputes" can be a "difficult task." Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 310 (1989). Circuit decisions confirm that the distinction is not always clear. See CSX Transp., Inc. v. Marquar, 980 F.2d 359, 382 (6th Cir. 1992) ("The problem is particularly acute in a case such as this where the union cannot know with certainty at the time it calls a strike whether a court will later decide that the dispute was minor or major."); Rutland Ry. Corp. v. Brotherhood of Locomotive Eng'rs, 307 F.2d 21, 33 (2d Cir. 1962) ("We readily recognize that here, as in other areas of jurisprudence, the difference, on the one hand, between the interpretation and the application of an existing agreement, and, on the other hand, a change in an original intended basis of agreement is often a question of degree."); cf. International Bhd. of Teamsters v. Southwest Airlines Co., 875 F.2d 1129, 1132 (5th Cir. 1989) (en banc) (holding en banc that dispute was minor after panel and district court had held that it was major). As the Sixth Circuit has said, "[i]f damages were available and the union guessed wrong [in calling a strike over what was later adjudged a minor dispute], it would be liable for damages that could deplete the union treasury and impair its effectiveness as the collective bargaining agent." Marquar, 980 F.2d at 382. Weakening a union

15

in this way would run counter to the RLA provisions aimed at ensuring that the parties are evenly matched as they pursue negotiations.**5**

In sum, we conclude that a damages remedy for a minor dispute strike is at odds with the structure and purpose of the RLA. In particular, the remedy would detract from the Act's requirement that minor disputes be resolved through bargaining or compulsory arbitration. Allowing the remedy would also run the risk of upsetting the balance of power between labor and management that has been maintained in the 74 years since the RLA was passed. Accordingly, we hold that monetary damages are not available under the RLA to remedy a strike over a minor dispute.**6** The judgment of the district court is therefore

AFFIRMED.

_____

**5** The circuit court decisions that have allowed employees to obtain damages (under the RLA) against carriers that interfered with the employees' right to organize and bargain collectively, see Lebow v. American Trans Air, 86 F.3d 661, 670-72 (7th Cir. 1996); Burke v. Compania Mexicana de Aviacion, S.A., 433 F.2d 1031, 1034 (9th Cir. 1970), and that have allowed employees to request damages for alleged breaches of the duty of fair representation, see Steele v. Louisville & Nashville R.R. Co., 323 U.S. 192, 204, 207 (1944); Brady v. Trans World Airlines, Inc., 401 F.2d 87, 96-100, 102-03 (3d Cir. 1968), are distinguishable. These cases deal with threats to the integrity of the collective bargaining process itself, and the RLA is fundamentally about that process. As we have emphasized, litigation to recover damages allegedly caused by a minor dispute strike is a diversion from the process of dispute resolution.

**6** There is a no-strike clause in the collective bargaining agreement between the union and the railroad. This leads us to note that our holding deals only with the unavailability of a damages remedy under the RLA for a minor dispute strike. What we have said has no bearing on whether the railroad might have sought contract damages in arbitration before the Adjustment Board. As the union points out, "[w]hether the [no-strike] clause includes an implicit damages remedy is grist for a Section 3 adjustment board because the question involves the interpretation or application of a collective bargaining agreement." Br. for Appellees at 32. See also Local 553, Transp. Workers Union of America v. Eastern Air Lines, Inc., 695 F.2d 668, 675 (2d Cir. 1982) (noting that Adjustment Board "can interpret contract clauses and award monetary damages").

16

WIDENER, Circuit Judge, concurring:

Because I agree with the majority that a damages remedy for a minor dispute is "at odds with the structure and purpose of the RLA," slip 16, I concur in the result. However, I disagree with the majority's depending as it does on implied rights of action under the Railway Labor Act and suggesting the obtaining of damages for breach of contract of a no-strike clause in an arbitration proceeding before the Adjustment Board for a strike over a minor dispute. See slip 13-16, 16 n.6.

In 1934, Congress created the statutory provision requiring compulsory arbitration before the Adjustment Board for minor disputes. See Railway Labor Act of 1934, 45 U.S.C. § 153. The compulsory arbitration provision forbade the use of a strike as a remedy for a minor dispute between a union and the railroad. [1] Arbitration before the Adjustment Board was the only right or remedy available. I agree with the majority that the 1934 amendments to the Act imposed a duty upon the railroads and the unions to arbitrate their minor disputes, but I do not agree that it is necessary to imply a right of action to enforce this duty. See slip 10-11.

As the the majority correctly notes, the Supreme Court in Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co., 353 U.S. 30 (1957), did not "say so directly" that an implied right of action or remedy exists under the Act to enforce the duty to arbitrate.[2] Rather, it simply upheld its earlier conclusion in Brotherhood of R.R. Trainmen v. Howard, 343 U.S. 768 (1952), that the federal courts had jurisdiction and power to enforce the Railway Labor Act by injunc-

_____

[1] The unions conceded their right to strike over minor disputes, and did so as a contribution to the national transportation system. See Brotherhood of R.R. Trainmen v. Chicago River & Indiana R.R. Co., 353 U.S. 30, 36-39 (1956) (examining the legislative history in Congress).

[2] Apparently, the phrase "implied right of action" or "implied cause of action" was first used in this context in CSX Transp. Inc. v. Marquar, 980 F.2d 359, 363-64 (6th Cir. 1992) (stating that the Supreme Court implied a right of action under the Act for a union's illegal strike by holding that federal courts could compel compliance with the Act).

17

tion. <u>Chicago River</u>, 353 U.S. at 42. I would go no further than the Supreme Court has gone.

<u>Moore v. Illinois Central R.R. Co.</u>, 312 U.S. 630 (1941), <u>overruled by</u>, <u>Andrews v. Louisville & Nashville R.R. Co.</u>, 406 U.S. 320 (1972), presented a parallel issue regarding the Railway Labor Act. <u>Moore</u> involved an individual railroad employee's suit against the railroad for damages due to wrongful discharge in violation of the collective bargaining agreement. See <u>Moore</u>, 312 U.S. at 631-32 (the aggrieved employee brought suit before exhausting his remedies under the Act). The Supreme Court, in <u>Moore</u>, construed the Act's provisions for minor dispute resolution as optional rather than compulsory. See <u>Moore</u>, 312 U.S. at 635-36 (examining the language in 45 U.S.C. § 153(i)-- "`may be referred to . . . the Adjustment Board'"). Despite contrary language by the Court in <u>Moore</u>, in 1965 this court held in <u>Walker v. Southern Railway Co.</u>, 354 F.2d 950 (4th Cir. 1965), that <u>Moore</u> had been overruled by implication by <u>Republic Steel Corp. v. Maddox</u>, 379 U.S. 650 (1965). The Supreme Court, however, reversed this court in a per curiam opinion in <u>Walker v. Southern Railway Co.</u>, 385 U.S. 196 (1966). Although the Court declined to overrule <u>Moore</u> in <u>Walker</u>, it did state that the "[p]rovision for arbitration of a discharge grievance, a minor dispute, is not a matter of voluntary agreement under the Railway Labor Act; the Act compels the parties to arbitrate minor disputes before the National Railroad Adjustment Board established under the Act." <u>Walker</u>, 385 U.S. at 198.

Later, in <u>Andrews v. Louisville & Nashville R.R. Co.</u>, 406 U.S. 320 (1972), the Court explicitly overruled <u>Moore</u> holding that "the notion that the grievance and arbitration procedures provided for minor disputes in the Railway Labor Act are optional, to be availed of as the employee or carrier chooses, was never good history and is no longer good law." <u>Andrews</u>, 406 U.S. at 322. Applicable to this case are the Court's statements that "in some situations the Act makes the [RLA] remedy <u>exclusive</u>," and "[i]n such a case [as here] the proceeding afforded by 45 U.S.C. § 153 First(i) will be the only remedy available to the aggrieved party." <u>Andrews</u>, 406 U.S. at 325 (emphasis added) (meaning that compulsory arbitration for minor disputes is the only remedy available).

18

It is significant that the Court did not state in the Chicago River decision, or in any subsequent decision, that an "implied right of action" is available under the Act for minor disputes. Despite its acknowledgment that "[the Court] did not say[an implied right of action exists under the RLA] directly," slip 11, the majority insists upon labeling the Supreme Court's holding in Chicago River as the Court's recognition of an implied right of action under the Act. I suggest that no support for this conclusion exists.

I am more troubled by the majority's suggestion that the railroad may obtain money damages in arbitration before the Adjustment Board for the union's breach of a no-strike clause in the parties' collective bargaining agreement. See slip 16 n.6. Although not explicitly defined in the Railway Labor Act, it is well established that a minor dispute is one which turns on the application of the parties' collective bargaining agreement's terms. See Elgin, Joliet & E. Ry. Co. v. Burley, 325 U.S. 711, 723 (1945). Grievances for actions like wrongful discharge or other disputes regarding the interpretation of a collective bargaining agreement are minor disputes which must be arbitrated before the Adjustment Board. See Andrews, 406 U.S. at 323-24 (1972). In the case before us, the minor dispute is about "one aspect of the railroad's work assignment authority under the collective bargaining agreement." Slip 3. The majority recognizes that there is a minor, not major, dispute in this case, but then goes on to suggest that the union's breach of the no-strike clause by striking might also qualify as a minor dispute to be arbitrated before the Adjustment Board. See slip 16 n.6. I disagree with this suggestion.

The Adjustment Board may award monetary damages for a minor dispute, like one for wrongful discharge, see 45 U.S.C. § 153(o), however, the suggestion that money damages could be awarded in arbitration before the Adjustment Board for a strike occasioned by a minor dispute is not supported within the Railway Labor Act's statutory scheme. The union may not strike over a minor dispute; it must resolve the dispute in arbitration as dictated by the Railway Labor Act. That union members illegally engaged in a strike over a minor dispute in violation of their statutory duty to arbitrate was not a "dispute[ ] between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working

19

conditions" under 45 U.S.C. § 153(i), as was held in <u>Louisville & Nashville R.R. Co. v. Brown</u>. 252 F.2d 149, 154 (5th Cir. 1958) (explaining that the legality of a strike over a minor dispute is not a dispute for the Adjustment Board, but that the courts have jurisdiction to enjoin such illegal strikes).

Finally, I note that the case the majority relies upon, <u>Local 553, Transp. Workers Union of Am. v. Eastern Airlines, Inc.</u>, 695 F.2d 668 (2d Cir. 1982), in my opinion, does not stand for the proposition that a union's strike over a minor dispute in violation of a no-strike clause constitutes the type of minor dispute to be adjudicated by the Adjustment Board. Rather, in its discussion of determining whether a dispute is a major dispute or a minor dispute, the Second Circuit recognized that "[i]f a carrier proposes to take action arguably permitted by the contract, opposition by the union based on a differing interpretation of the contract is a minor dispute subject to binding adjudication by the appropriate Adjustment Board, which can interpret contract clauses and award monetary damages." <u>Local 553</u>, 695 F.2d at 674-75. Because engaging in a strike over a minor dispute is forbidden by the Railway Labor Act, see <u>Chicago River</u>, 353 U.S. at 39-42, such a strike is not a matter of differing interpretations of a contract. It is not a minor dispute.

20