[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT



**FILED**

**U.S. COURT OF APPEALS**
**ELEVENTH CIRCUIT**
**APRIL 21, 2003**
**THOMAS K. KAHN**
**CLERK**

_____

No. 01-15410

_____

D. C. Docket No. 95-00813-CV-3-J-21

CSX TRANSPORTATION, INC.,

Plaintiff-Counter-
Defendant-Appellant
Cross-Appellee,

versus

BROTHERHOOD OF MAINTENANCE OF
WAY EMPLOYEES, ("BMWE"),
ALLIED EASTERN FEDERATION OF THE
BROTHERHOOD OF WAY EMPLOYEES,

Defendants-Counter-
Claimants-Appellees
Cross-Appellants,

SOUTHEAST SYSTEM FEDERATION, BMWE,

Defendant-Counter-
Claimant.

Appeals from the United States District Court
for the Middle District of Florida

_____

**(April 21, 2003)**

Before BIRCH and BLACK, Circuit Judges, and PROPST[*], District Judge.

BIRCH, Circuit Judge:

In this appeal, we decide whether damages are available under the Railway Labor Act ("RLA"), 45 U.S.C. §§ 151-164, to recover costs incurred by a carrier associated with a surprise illegal strike initiated by a union. Before reaching this query, we address whether this issue, as it arises between the parties, is precluded by collateral estoppel. Deciding that it does not preclude our determination of the case on its merits, we review the nature of the labor disputes between the parties: whether they were major or minor within the RLA. Because we hold that the disputes were minor within the RLA, and thus the union-instituted strike was illegal, we decide whether the carrier is entitled to recover damages incurred by the interruption in service because it did not have notice that the strike was impending, sufficient to permit it to seek injunctive relief prior to the strike. Finding ourselves

_____

[*] Honorable Robert B. Propst, United States District Judge for the Northern District of Alabama, sitting by designation.

bound by precedent, now arguably obsolete, we are compelled to find the answer to be in the negative, yet urge the reconsideration of this proceeding en banc. For the following reasons, we AFFIRM.

## I. BACKGROUND

CSX Transportation, Inc. ("CSXT") is a national rail carrier, whose labor relations are governed by the RLA. The Brotherhood of Maintenance of Way Employees ("BMWE") is the collective bargaining representative of CSXT maintenance of way workers. Maintenance of way employees are responsible for repairing and maintaining the railroad track and supporting structures. Negotiations between CSXT and BMWE resulted in collective bargaining agreements (hereinafter "agreements"), which governed rates of pay, work rules and working conditions, and were subject to the provisions of the RLA. The collective bargaining agreement at issue (the "Agreement") was executed and administered between defendant Southeast System Federation, a BMWE sub-unit,[1] and CSXT. The Agreement covered what is now the former Louisville and Nashville Railroad Company ("L&N") and a part of CSXT's rail system.

---

[1] Co-defendant Southeast System Federation is a sub-unit of defendant BMWE. Since the commencement of this litigation, Southeast System Federation merged into Allied Eastern Federation, which was later substituted as a defendant.

3

On 11 August 1995, BMWE authorized a strike against CSXT. On 17 August 1995, BMWE initiated a strike across eleven states against CSXT on two bases: (1) BMWE objected to CSXT's practice of permitting its supervisors, responsible for inspecting the tracks, to make minor repairs during the course of their inspections; and (2) CSXT's refusal to award a position to Dewey C. Hamilton, who claimed seniority right to the position within the seniority district.

The first dispute involved whether BMWE employees had the exclusive right to make track repairs, regardless of how minor, or whether it was within the scope of the Agreement that supervisors also could make occasional minor repairs of defects found during the course of their inspections. Rule 1 of the Agreement, dated 1 October 1973 (the "Scope Rule") provides:

RULE 1. SCOPE

Subject to the exceptions in Rule 2, the rules contained herein shall govern the hours of service, working conditions, and rates of pay for all employes[2] in any and all subdepartments of the Maintenance of Way and Structures Department, represented by the Brotherhood of Maintenance of Way Employes, and such employes shall perform all work in the maintenance of way and structures department.

RULE 2. EXCEPTIONS TO RULE 1

---

[2] "Employes" is an alternate spelling for "Employees." The Random House Dictionary of the English Language 638 (2d ed. 1987). We will use the latter spelling unless the former appears in quoted language or in the parties' names.

4

These provisions shall not apply to the following, except as to the retention and exercise of seniority by the individuals as outlined in the seniority rules:

. . .

2(c) Supervisors and assistants, and other employes above that rank; .

. . .

R6-140 at JA 27-28, R6-141 at JA 571.[3]

Prior to the 17 August 1995 strike, BMWE consistently took the position that CSXT's inspectors could not perform any repairs that were maintenance-of-way work because that was reserved to BMWE workers. BMWE asserted this position in many disputes, most of which were resolved by settlement, withdrawal or arbitration. The proverbial "last straw" was CSXT's permitting two supervisors to perform minor track repairs and abolishing a BMWE member-held truck driver position. R6-146 at 8. In the past, the truck drivers accompanied the CSXT supervisors on their inspections and were available to perform any necessary minor repairs. With the elimination of the position, CSXT inspectors would be unaccompanied in their inspections and would perform the minor work themselves,

---

[3] On 17 September 1998, the Agreement was amended to permit track inspectors to "perform inspection of track, as assigned, *perform any track work in connection with their inspections*, and complete required reports to insure safe and timely passage of trains and compliance with the Federal Railroad Safety Act of 1970." R6-141 at JA 560 (emphasis added). On 1 October 1998, the parties entered into a side agreement that provided that "[t]he agreement . . . has no effect upon the dispute between the parties concerning managers performing repairs as identified in CSX Transportation, Inc. v. Brotherhood of Maintenance of Way Employes et al., United States District Court, Middle District of Florida, Jacksonville Division, Case No. 95-0813-CIV-J-21-B." R6-141 at JA 562. Therefore, the September 1998 agreement has no effect on this dispute and did not alter the positions of the parties.

ostensibly in the interest of efficiency in avoiding a separate BMWE employee trip out to the track. BMWE held the view that a CSXT supervisor, if alone in the field, instead should summon a BMWE employee to make the repair.

The second dispute involved CSXT's initial refusal to award a track repairman position to a BMWE member because a dispute existed as to his seniority rights. Generally, agreements between CSXT and BMWE divided the rail system into seniority districts, wherein an employee could hold seniority in one district at a time. Dewey C. Hamilton had seniority in a seniority district on the former Chesapeake & Ohio Railway (C&O). He was furloughed for lack of work on the C&O and permitted to transfer on 23 May 1995 to another district on the former L&N, which was also part of CSXT's system, and given a trackman position. When a better position became available on the L&N, Hamilton bid on that position. CSXT initially declined to award him the position because it was uncertain whether Hamilton properly established seniority on the L&N. BMWE took the stance that Hamilton should be awarded the position because he was the only employee who bid on it. CSXT and BMWE negotiated regarding the issue. CSXT took the position that "policy will supersede the agreement" and refused to recognize Hamilton's seniority and position bid. R6-146 at 9. Ultimately, on the date BMWE commenced the strike, CSXT conceded to award Hamilton the

6

position and applied his seniority retroactive to the date that he transferred to the L&N seniority district.

Discussions ensued between CSXT and BMWE as a result of these two issues. Finding no ready resolution, BMWE secretly prepared to engage the BMWE employees across eleven states in a strike over these two issues. Id. at 10-11. Without any formal or informal notice to CSXT, BMWE called the eleven-state strike on 17 August 1995. Later that same day, CSXT filed suit in the United States District Court for the Middle District of Florida and claimed that BMWE's strike violated § 152, First and § 153 of the RLA. CSXT prayed for and was granted a temporary restraining order halting the strike by BMWE workers. On 28 August 1995, the district court heard argument on whether to grant CSXT's motion for a preliminary strike injunction. The same day, the district court issued the preliminary injunction.

On 2 October 1995, BMWE filed a counterclaim alleging that CSXT violated the RLA by unilaterally changing working conditions and failing to maintain the parties' collective bargaining agreements when it permitted inspectors to perform repair work exclusively reserved for maintenance-of-way employees. BMWE also filed motions to dismiss CSXT's claim for damages and state-law claim for tortious interference with contractual rights.

7

On 24 February 1997, BMWE moved to dissolve the preliminary injunction on the basis that the strike was instituted over a major dispute as defined by the RLA. BMWE argued that "the [National Railroad Adjustment Board ("NRAB")] . . . issued an Award construing provisions of the parties' agreement that are relevant to this dispute in such a way that the interpretation of the contract offered by the plaintiff in support of its motion for a preliminary injunction can no longer be said to be arguable under the terms of that agreement." R4-84 at 1-2. The district court denied the motion. On 1 February 1999, the district court dismissed CSXT's damages and state-law claims. The district court based this decision, "[i]rrespective of whether Brown[4] is still binding precedent in this Circuit and even if whether Brown is still vital following Franklin,[5]" on "the reasoning of the Marquar[6] majority, which includes a full consideration of Franklin, and thus . . . [held] that damages are not an appropriate remedy for the violations of RLA § 152, First or [§] 153, First alleged in this case." R5-115 at 13. The district court declined to address the argument by BMWE that the litigation of the damages issue as between CSXT and BMWE was precluded by Marquar on collateral estoppel grounds.

---

[4] Lousiville & Nashville Railroad Co. v. Brown, 252 F.2d 149 (5th Cir. 1958).

[5] Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 112 S. Ct. 1028 (1992).

[6] CSX Transportation Inc. v. Marquar, 980 F.2d 359 (6th Cir. 1992).

After the parties filed cross-motions for summary judgment, on 20 August 2001, the district court granted summary judgment in favor of CSXT, finding that the dispute regarding the inspectors' repair work was minor within the meaning of the RLA. The district court noted the other dispute leading to the strike regarding the seniority rights of Hamilton and treated it as having been resolved rather than determine whether the seniority dispute was major or minor. Pursuant to Consolidated Rail Corp. v. Railway Labor Executives' Ass'n, 491 U.S. 299, 109 S. Ct. 2477 (1989) ("Conrail"), the district court limited its inquiry to whether CSXT's action was "arguably justified" by interpretation of the parties' agreement. R7-165 at 13 (quoting Conrail, 491 U.S. at 306, 109 S. Ct. at 2482). Finding the "argument is plausible at minimum," the district court determined that CSXT met this low threshold and that the dispute was minor within the meaning of the RLA. Id. at 12-13. The preliminary injunction was converted to a permanent injunction. The district court also discussed CSXT's request for declaratory relief that BMWE had violated the RLA by failing to give advance notice but declined to decide the issue because BMWE was then subject to a general advance notice requirement arising from a case pending in Texas, Burlington North & Santa Fe Railway Co. v. Brotherhood of Maintenance of Way Employes, 143 F. Supp. 2d 672 (N.D. Tex.

2001), and damages were not available. From that final order, this appeal followed.

CSXT appeals the district court's order granting of BMWE's motion to dismiss, which held that a damages remedy was not appropriate for violations of RLA § 152, First and § 153. BMWE argues that the damages issue raised by CSXT is barred by issue preclusion and, if it is not, the district court's decision was supported by law within our circuit and consistent with cases decided in other jurisdictions. BMWE also cross-appeals the district court's treatment of the seniority dispute as resolved and argues that the district court failed to apply the proper test under Conrail and that the facts were disputed such that the district court's grant of summary judgment in favor of CSXT was improper.

We will first address whether issue preclusion principles prevent the adjudication of the merits of the parties' appeals. Second, we turn to BMWE's cross-appeal of the district court's determination whether the seniority dispute was major or minor under the RLA. After we decide that the seniority dispute is also minor within the meaning of the RLA, thus rendering BMWE's strike illegal, we will turn to whether CSXT is entitled to recoup compensatory damages incurred as a result of the strike.

## II. DISCUSSION

The case before us culminates in a specific query: whether CSXT can recover compensatory damages from BMWE, incurred as a result of BMWE's illegal strike over a minor dispute, because BMWE did not give advance notice to CSXT of its intent to strike. Initially, however, BMWE claims that the doctrine of collateral estoppel precludes us from deciding this issue because CSX Transportation Inc. v. Marquar, 980 F.2d 359 (6th Cir. 1992), litigated between CSXT and BMWE and decided ten years ago in the United States Court of Appeals for the Sixth Circuit, purportedly reached the same issue to hold that damages are never recoverable for an implied right of action under RLA § 152, First and § 153. Thus, because BMWE and CSXT are also parties in this suit, CSXT is precluded from arguing the same issue before us now. The district court recognized the argument but did not address whether issue preclusion applied in this case because it found itself persuaded by the reasoning of Marquar. BMWE has a heavy burden to prevail on the ground of issue preclusion; one that we find it cannot carry because one material factual distinction differentiates this case from Marquar such that we are not bound to defer to its decision. After addressing BMWE's defense of issue preclusion below, we reach the merits of the parties' appeal and cross-appeal.

A.  Issue Preclusion

BMWE proffers a provocative, yet unpersuasive, argument that CSXT is collaterally estopped from arguing that it is entitled to recover compensatory damages under RLA § 152, First and § 153 because the Sixth Circuit in Marquar decided broadly that monetary damages are never recoverable under RLA § 152, First and § 153.[7] In Marquar, CSXT brought suit against BMWE for declaratory,

_____

[7] Because we decide that there exists a material differentiating fact that prevents the application of issue preclusion, we will not decide whether the issue before us meets an exception to the issue preclusion doctrine, but will note its potential applicability. Restatement (Second) of Judgments § 28 lists "Exceptions To The General Rule of Issue Preclusion":

> Although an issue is actually litigated and determined by a valid and final judgment, and the determination is essential to the judgment, relitgation of the issue in a subsequent action between the parties is not precluded in the following circumstances:
> . . .
> (2) The issue is one of law and (a) the two actions involve claims that are substantially unrelated, or (b) a new determination is warranted in order to take account of an intervening change in the applicable legal context or otherwise to avoid inequitable administration of the laws . . .

In Montana v. United States, 440 U.S. 147, 99 S. Ct. 970 (1979), the Supreme Court recognized the "'unmixed question of law' in successive action involving substantially unrelated claims" exception to estoppel principles. Id. at 162, 99 S. Ct. at 978 (quoting United States v. Moser, 266 U.S. 236, 242, 45 S. Ct. 66, 67 (1942):

> Where, for example, a court in deciding a case has enunciated a rule of law, the parties in a subsequent action *upon a different demand* are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases.  But a *fact, question* or *right* distinctly adjudged in the original action cannot be disputed in a subsequent action, even though the determination was reached upon an erroneous view or by an erroneous application of the law.) (emphasis added).

The true nature and applicability of this exception is generally uncertain. See Henglein v. Colt Indus. Operating Co., 260 F.3d 201 (3d Cir. 2001) ("This exception has been discussed by courts

injunctive and compensatory relief, claiming that BMWE's nine-state strike over the location where the workers were to eat their lunches was unlawful because it involved a minor dispute. BMWE had threatened strike and CSXT filed suit just days prior to the strike's authorization and institution. CSXT, however, did not obtain a temporary restraining order until hours later on the same day the strike began. The parties submitted to arbitration, at which the arbitration panel deemed the dispute minor and resolved the dispute within the arbitration process. CSXT maintained its action for compensatory relief, claiming that it suffered damages from the, albeit brief, interruption in its train service. The district court granted BMWE's motion to dismiss, finding that damages had never been awarded under the RLA for unlawful strikes over minor disputes, nor had Congress affirmatively provided for such remedy.

On appeal, CSXT argued that a damages remedy was appropriate because the Supreme Court found an implied a right of action under the RLA. BMWE countered with authority from other circuits which denied damages for unlawful strikes and argued that the availability of damages would upset the balance of power between labor and management. The majority accepted BMWE's

---

but none has yet delineated its boundaries very well.") (citing United States v. Stauffer Chem. Co., 464 U.S. 165, 170, 104 S. Ct. 575 (1984)). As we understand the exception, the legal issue in this case arguably manifests an "unmixed question of law" and would appear to fall squarely within this exception.

13

arguments and held that damages were not available for violation of RLA § 152, First and § 153, although damages generally were available under the RLA in certain circumstances. The court utilized the framework provided by Franklin v. Gwinnett County Public Schools, 503 U.S. 60, 112 S. Ct. 1028 (1992), to determine whether a damages remedy was available in an implied right of action for violation of the RLA § 152, First and § 153. The Sixth Circuit held that Marquar was not an "appropriate case" for damages under the RLA, relying upon the historical reluctance to award damages for strikes over minor disputes and the almost exclusive reliance upon injunctive remedies. Marquar, 980 F.2d at 379-80. That court also found that "[i]n the volatile atmosphere of labor-management relations, the threat of a damages action could upset the balance intended by the RLA." Marquar, 980 F.2d at 382. Finally, the majority opinion elected to leave it within the purview of Congress to create a damages remedy at such an "advanced stage of the RLA's development." Id. (quoting Burlington N. R.R. Co. v. Bhd. of Maint. of Way Employes, 481 U.S. 429, 435, 107 S. Ct. 1841, 1855 (1987)) (italics omitted).

Given that the matter before us is a federal question previously decided by a federal court, it naturally follows that federal preclusion principles apply in this case. In Pleming v. Universal-Rundle Corp., 142 F.3d 1354, 1356 n.1, 1360 n.6

14

(11th Cir. 1998), we expressed uncertainty whether state or federal preclusion principles should be applied by the deciding court, citing diverging cases that employed federal and state law. Although we invited briefing on the issue, it has not heretofore been forthcoming. We previously held that "[w]hen a federal court sitting in diversity examines the collateral estoppel or res judicata effect of a prior federal judgment, based either on diversity or a federal question, it must apply federal common law." Precision Air Parts, Inc. v. Avco Corp., 736 F.2d 1499, 1503 (11th Cir. 1984). We now hold that federal preclusion principles apply to prior federal decisions, whether previously decided in diversity or federal question jurisdiction. See Winters v. Diamond Shamrock Chem. Co., 149 F.3d 387, 393 n.6 (5th Cir. 1998) ("[F]ederal law of issue preclusion applied because the prior decision had been issued by a federal court, albeit in a diversity action."); In re Docteroff, 133 F.3d 210, 214 (3d Cir. 1997) ("Because the prior judgment was rendered by a federal court, we apply federal principles of collateral estoppel."); Trevino v. Gates, 99 F.3d 911, 923 (9th Cir. 1996) ("Federal law governs the collateral estoppel effect of a case decided by a federal court.").

Finding that federal issue preclusion rules apply, we next determine whether the issue in this case is predestined for the same result because it meets the criteria for application of the doctrine. "Collateral estoppel or issue preclusion forecloses

15

relitigation of an issue of fact or law that has been litigated and decided in a prior suit. There are several prerequisites to the application of collateral estoppel: (1) the issue at stake must be identical to the one involved in the prior litigation; (2) the issue must have been actually litigated in the prior suit; (3) the determination of the issue in the prior litigation must have been a critical and necessary part of the judgment in that action; and (4) the party against whom the earlier decision is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding." I.A. Durbin, Inc. v. Jefferson Nat'l Bank, 793 F.2d 1541, 1549 (11th Cir. 1986). "Collateral estoppel . . . has the dual purpose of protecting litigants from the burden of relitigating an identical issue with the same party or his privy and of promoting judicial economy by preventing needless litigation." Parklane Hosiery Co. v. Shore, 439 U.S. 322, 326, 99 S. Ct. 645, 649 (1979).

The adversaries in Marquar and in this appeal are the same: BMWE and CSXT. BMWE is attempting to assert issue preclusion against CSXT regarding the issue whether damages are available for an unlawful strike over a minor dispute, claiming that Marquar decided the very same issue against CSXT approximately ten years ago. The first prerequisite is whether the issue in this case is identical to the issue litigated in Marquar. The Marquar court decided generally that damages are not available under RLA § 152, First and § 153, First. We

16

recognize that, depending on the level of abstraction we apply to the Marquar decision, it would be conceivable to find that, because of the Sixth Circuit's broad legal holding, we would be precluded from deciding the same legal question here.

The issue preclusion doctrine, however, first directs our attention to the relative similarity of the facts of each case, and rightfully so. If we were bound by broad legal decisions by other courts at a given level of abstraction out of the facts of every similar case by the mere fact of an identical caption, the novel defense of issue preclusion would serve to bind the adjudication of many more cases than would serve the interests of justice and move outside the scope of the purposes of collateral estoppel.

That identical parties (or privies) are involved in this case and in Marquar is but a threshold requirement of issue preclusion. CSXT need only point to one material differentiating fact that would alter the legal inquiry here and thereby overcome the preclusive effect of Marquar. Sewell v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 94 F.3d. 1514, 1519 (11th Cir. 1996). Admittedly, the disputes are substantially similar: both involve a dispute that went unresolved through the arbitration vehicles provided for in the RLA; both involved the interpretation by BMWE of the dispute as major, thus avoiding the mandatory arbitration of the dispute; both involved the institution of a strike prior to CSXT's

ability to obtain injunctive relief to avoid the strike; both cases resulted in a determination that the dispute was minor and, therefore, the strike was deemed unlawful after the fact; and, finally, both cases involve the very specific issue whether compensatory damages are available for an unlawful strike by the union over a minor dispute. CSXT raises, however, one important fact in this case that did not exist in Marquar: CSXT had no notice, and there was no attempt by BMWE to give notice that a strike was impending. This fact, we will demonstrate below, undercuts the preclusive effect of Marquar because it changes the legal inquiry; to what extent and whether it changes the result is of no moment at this juncture.

BMWE argues that the lack of notice was not a controlling fact and not essential to the resolution in Marquar.[8] BMWE relies on the broad legal holding of Marquar, that damages are never recoverable for unlawful strikes over minor

_____

[8] Alternatively, BMWE argues that CSXT cannot claim that surprise is a differentiating material fact because CSXT claimed in its submissions in Marquar that it did not seek a restraining order because it was under the impression from assurances by BMWE that a strike was not imminent, therefore, CSXT also did not have notice in Marquar. Appellee Br. at 16-17 n.7. It is clear from the facts of Marquar that CSXT had some notice, albeit unreliable and informal, that a strike was impending and was able to file a suit in the district court. That CSXT did not seek an injunction when it had the time, and thereby suffered the consequence, does not mean that it did not have any notice of the impending strike, as apparently was the case here. We acknowledge that notice of impending strikes in the past was not necessarily acquired through formal communication and account for that in our discussion. Nevertheless, no notice existed here, in any form, and that is a material, differentiating fact that warrants the benefit of adjudication of the merits of the case before us.

18

disputes to subsume the fact whether notice existed or not. If the notice, or lack thereof, did not inform the legal decision of Marquar, then the fact of notice cannot be used to avoid the preclusive effect of the blanket holding. Marquar is a decision of law on a motion to dismiss and is necessarily based upon the facts as alleged in the case before it. It is undisputed that some notice, whether informal or formal, was present in Marquar. Therefore, to the extent that BMWE seeks to extend the holding of Marquar beyond the scope of facts in that case to the level of a blanket preclusive effect, regardless of deviation from the facts upon which the decision was based, gives the dicta of Marquar preclusive effect. Although Marquar is a legal decision and written in broad terms, we decline to give the broad holding preclusive effect because to do so would give dicta preclusive effect. See Restatement (Second) of Judgments § 27h (1982).

Because we have concluded that the facts in this case are materially different, to give Marquar preclusive effect is inappropriate, and we need not further track the issue preclusion requirements. A material difference in fact necessarily leads us to conclude here that the issue was not "actually litigated" and could not possibly have been "critical and necessary" to the judgment. Although we cannot point to explicit "contrary precedent," nor do we need to because of the factual differences, we will note that emergent case law, infra, steers the legal

19

inquiry sufficiently to persuade us that it is appropriate to adjudicate the issue before us in light of that law.

Clearing the potential hurdle of issue preclusion, we now address the merits of the cross-appeal and appeal before us. We first address BMWE's cross-appeal, which argues that the seniority dispute is a major dispute, that the issue was not actually decided by the district court and, furthermore, that summary judgment was not appropriate because a material fact remained in dispute.

## B. The Seniority Dispute - Major or Minor?

BMWE appeals the district court's grant of summary judgment in favor of CSXT, arguing that the district court erred in its failure to apply the Conrail test to the seniority dispute between BMWE and CSXT, about which BMWE maintains disputed facts exist regarding whether the dispute was minor within the definition of the RLA. Before we can reach the damages issue in this case, we first must address whether the district court erred in granting summary judgment to CSXT in and failing to determine whether the seniority dispute between the parties was minor.[9] If we find that the district court erred, BMWE would be in a position to argue that the seniority dispute was major and justified self-help in the form of a

---

[9] BMWE does not appeal the district court's determination that the inspector track repairs dispute was "minor" within the meaning of the RLA.

strike, thus there would be no illegal strike from which CSXT could allege a claim for compensatory damages.

BMWE argues, first, that the district court did not make the required findings mandated by Conrail and, second, that there existed disputed facts precluding a decision on summary judgment. BMWE submits that the case should be remanded to the district court on this issue. CSXT responds that BMWE's cross-appeal is moot, as admitted by BMWE in the proceedings before the district court. In addition, CSXT maintains that the record clearly supports that the seniority dispute was minor under the RLA.

"If the appeal is moot, this court lacks jurisdiction to decide the case because it fails to meet the case or controversy requirement set forth in the U.S. Const. art. III, § 2." National Broad. Co. v. Communications Workers of Am., AFL-CIO, 860 F.2d 1022, 1023 (11th Cir. 1988) ("NBC"). The district court found that the inspector-repair dispute was minor within the meaning of the RLA. The parties do not dispute this result. The district court's discussion of the seniority dispute's characterization, however, was relegated to a cursory footnote. The district court ostensibly regarded the issue as settled and without need of further decision because the matter was resolved by the parties just prior to the Temporary Restraining Order hearing. We conclude that we are not precluded from deciding

21

the classification of the seniority dispute for mootness reasons even though it was resolved before the decision by the district court. Despite the fact the dispute had been settled, the legal determination whether the seniority dispute was minor or major was relevant and necessary to the resolution of the case going forward. The decision was relevant because a classification of the seniority dispute as major would then mean that the strike was not necessarily instituted over only a minor dispute. Thus, BMWE possibly would have a defense to CSXT's claim for damages from an illegal strike over a minor dispute if the strike was also legally instituted over a major dispute - the seniority issue. The issue whether the seniority dispute was major or minor remained controverted and, as we mentioned supra, is relevant to whether the strike was illegal at the time it was initiated. Thus, that the dispute was settled between the parties prior to the hearing is of no consequence.

Moreover, underlying labor disputes presumably remain "live," although they might be settled or abandoned by the parties in the meantime. In NBC, we noted that

> [t]he Supreme Court has acknowledged that labor conflicts are the sort of disagreements likely to be repeated in the future. See, e.g., Buffalo Force Co. v. U. Steelworkers of America, AFL-CIO, 428 U.S. 397, 403 & n.8, 96 S. Ct. 3141, 3145-46 & n.8 . . . (1976). See also, Jacksonville, Etc. v. Intern. Longshoremen's Ass'n, 457 U.S. 702, 704 n.1, 102 S. Ct. 2672, 2676 n.1 . . . (1982) . . .; 13A C. Wright, A. Miller & E. Cooper, Federal Practice and

22

Procedure § 3533.3 at 287 (1984) ("labor disputes . . . provide clear illustration of the private disputes that are preserved from mootness by the prospect of future repetition.").

860 F.2d at 1024 n.2 (finding case was not moot because it was capable of repetition). Accordingly, we will not refuse to adjudicate the case on mootness grounds because, not only does the issue remain relevant between the parties, but it is the exact type of issue that would recur on a regular basis and perpetually escape review.

The RLA distinguishes between two types of disputes in labor relations - major and minor. Depending on the classification of the dispute, each party must follow certain procedures mandated by the RLA. If a dispute is "minor" the parties are prohibited from striking and must submit to compulsory arbitration of the dispute by the NRAB. 45 U.S. C. § 153, First. During the arbitration, however, neither party is prevented from implementing the disputed policy. Conrail, 491 U.S. at 304, 109 S. Ct. 2481. If the dispute is "major" within the meaning of the RLA, on the other hand, the parties are subject to a lengthy and involved dispute resolution process, during which the parties are obligated to maintain the status quo. See 45 U.S.C. §§ 152, Seventh, 155 & 156. "The district courts have subject-matter jurisdiction to enjoin a violation of the status quo pending completion of the required procedures, without the customary showing of

irreparable injury." Conrail, 491 U.S. at 303, 109 S. Ct. at 2480. If the party proceeds to implement the disputed policy, in breach of the status quo, the other party is entitled to resort to self-help, i.e., a union can call a strike. Id.

Each party, acting in its own interest, will have different motives to assign a certain classification to the dispute. For example, a union will typically claim a dispute is major because it is permissible to strike if the carrier insists on implementing a certain policy. Conversely, a carrier will insist the dispute is minor because it can proceed with the policy while the parties are compelled to navigate the arbitration process. Accordingly, the district court is placed in the position to determine the nature of the dispute, without necessarily reaching the merits of the dispute. Conrail, 491 U.S. at 306, 109 S. Ct. at 2482. "[T]here is a danger in leaving the characterization of the dispute solely in the hands of one party. In a situation in which the party asserting a contractual basis for its claim is 'insincere' in so doing, or its 'position [is] founded upon . . . insubstantial grounds,' the result of honoring that party's characterization would be to undercut 'the prohibitions of [the RLA]' against unilateral imposition of new contractual terms. . . . In such circumstances, protection of the proper functioning of the statutory scheme requires the court to substitute its characterization for that of the claimant." Id. (alteration and first omission in original) (internal citations omitted).

24

The district court's classification of a dispute as major or minor under the RLA is a question of law we review de novo. Bhd. of Maint. of Way Employees v. Atchison, Topeka & Santa Fe Ry. Co., 138 F.3d 635, 639 (7th Cir. 1997); United Transp. Union v. South Carolina Public Ry. Comm'n, 130 F.3d 627, 631(4th Cir. 1997); Fry v. Airline Pilots Ass'n, Int'l, 88 F.3d 831, 835 (10th Cir. 1996); General Comm'n of Adjustment, United Transp. Union v. CSX R. R. Corp., 893 F.2d 584, 589 (3d Cir. 1990); Sheet Metal Workers' Int'l Ass'n v. Burlington N. R.R. Co., 893 F.2d 199, 201 (8th Cir. 1990).

A major dispute:

> "relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past."

Conrail, 491 U.S. at 302, 109 S. Ct. at 2480 (quoting Elgin, J. & E. Ry. Co. v. Burley, 325 U.S. 711, 723, 65 S. Ct. 1282, 1290 (1945)).

On the other hand, a minor dispute is "a dispute arising or growing 'out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions.'" Conrail, 491 U.S. at 303, 109 S. Ct. at

25

2480 (quoting 45 U.S.C. § 153, First (i)); see 45 U.S.C. §§ 152, Second & 153,

First (i).  To elaborate:

> "[A minor dispute] contemplates the existence of a collective
> agreement already concluded or, at any rate, a situation in
> which no effort is made to bring about a formal change in terms
> or to create a new one.  The dispute relates either to the
> meaning or proper application of a particular provision with
> reference to a specific situation or to an omitted case.  In the
> latter event the claim is founded upon some incident of the
> employment relation, or asserted one, independent of those
> covered by the collective agreement, e.g., claims on account of
> personal injuries.  In either case the claim is to rights accrued,
> not merely to have new ones created for the future."

Conrail, 491 U.S. at 303, 109 S. Ct. at 2480-81 (quoting Burley, 325 U.S. at 723,

65 S. Ct. at 1289-90).

> Thus, the formal demarcation between major and minor
> disputes does not turn on a case-by-case basis determination of
> the importance of the issue presented or the likelihood that it
> would prompt the exercise of economic self-help. . . .   Rather,
> the line drawn in Burley looks to whether a claim has been
> made that the terms of an existing agreement either establish or
> refute the presence of a right to take the disputed action. The
> distinguishing feature of such a case is that the dispute may be
> conclusively resolved by interpreting the existing agreement.

Id. at 305, 109 S. Ct. at 2481-82 (internal citations omitted).

The Supreme Court articulated the standard for differentiating between

major and minor disputes in Conrail.  "Where an employer asserts a contractual

right to take the contested action, the ensuing dispute is minor if the action is

arguably justified by the terms of the parties' collective-bargaining agreement. Where, in contrast, the employer's claims are frivolous or obviously insubstantial, the dispute is major." Id. at 307, 109 S. Ct. at 2483. The Court noted that the threshold to bind the parties to the "exclusive arbitral jurisdiction" accompanying a minor dispute is a low one. Id., 109 S. Ct. at 2482. "Additionally, if a reasonable doubt exists as to whether the dispute is major or minor, we will deem it to be minor." Dement v. Richmond, Fredericksburg & Potomac R.R. Co., 845 F.2d 451, 463 (4th Cir. 1988) (citing Atchison, Topeka & Santa Fe Ry. Co., 768 F.2d at 920)).

BMWE argues that there exists a genuine issue of material fact as to whether the seniority dispute was minor, thereby precluding the award of summary judgment in favor of CSXT. BMWE urges us to remand the issue to the district court for adjudication on its facts. Because the issue whether the dispute is minor or major is one of law, and because the facts as presented to us in the record do not present a disputed material fact issue, we are in a position to resolve the matter at this time. See Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S. Ct. 2548, 2554 (1986). Although BMWE asserts that disputed facts exist that make summary judgment improper, the issue is facile; that is, whether CSXT recognized Hamilton's seniority and position bid prior to or after BMWE initiated the strike.

27

The timing of possible resolution of the dispute between the parties is immaterial to whether the dispute was major or minor under the RLA and does not change the perspective from which we interpret the nature of the dispute between the parties to make that determination. However, we recognize that, if we determined the dispute to be major, which we do not, the disputed issue of when a settlement was reached might then be relevant to decide whether BMWE had a defense to CSXT's claim for damages because if the dispute was not settled before the strike, BMWE would have a potential defense that the strike was warranted over the major dispute.

We conclude that CSXT's position regarding the seniority dispute was "arguably justified" by the terms of the Agreement and thus the dispute is minor under the RLA. CSXT argues that the resolution of the dispute depended on the interpretation of Rules 6, 16, and 26 of the existing L&N Agreement. BMWE also cited these provisions and the fact that Hamilton was the only person to bid on the position to argue that he was entitled to it. When Hamilton transferred from one seniority district to another, it was unclear under the Agreement whether the date of his seniority began at the time that he started work under the first seniority district and that time transferred when he was furloughed and rehired in a different district, or whether he was a "new employee" and his seniority computation began

28

at the time that he began working in the new position in the second seniority district. Furthermore, Rule 26(d) of the Agreement provided dispute resolution procedures in the event that "an employe[e] is denied a position under circumstances which he deems erroneous." R2-20, Ex. 1.

It is clear from the parties' arguments and the nature of the dispute that the resolution of the matter depended on the existence and interpretation of the Agreement. CSXT's denial of the position to Hamilton was "arguably justified" by the terms of the Agreement, because there existed uncertainty as to the interpretation of its terms and, therefore, as to which point his seniority was computed. Contrary to BMWE's insistence that CSXT unilaterally changed the Agreement by denying Hamilton's position bid, we find that CSXT's position regarding Hamilton's seniority rights was a justifiable interpretation of the Agreement provisions that would be ultimately resolved by a resolution of the correct interpretation of the Agreement's seniority provisions. Because the resolution of the seniority dispute necessarily involved an interpretation of the Agreement, the dispute is minor within the meaning of the RLA under the Conrail test. We will not discuss whether CSXT's interpretation is a correct one; it is not within the scope of our review to decide the merits of the dispute before us, but

29

merely to classify it as major or minor. See Conrail, 491 U.S. at 306, 109 S. Ct. at 2482.

Accordingly, we find that the BMWE-instituted strike was predicated on not just one but two minor disputes and was thus illegal under the RLA. We now turn to whether CSXT is entitled to recover compensatory damages incurred as a result of the illegal strike.

C. Availability of Compensatory Damages Incurred from an Illegal Strike Initiated by BMWE without Notice to CSXT

Although the issue as to whether damages are recoverable for an illegal strike over a minor dispute is not new, there is relatively sparse case law especially considering the long history of the RLA, such that we are not convinced that the issue has been fully examined nor has it been developed to establish well-settled principles. The reason for this is unclear, but we are satisfied to presume that generally the RLA is accomplishing the purposes for which it was envisioned, and is successful to such a degree that generally unions and carriers are settling their disputes within the constructs of the RLA and using the courts as a last resort in the few instances the law has been ineffective. Thus, we find ourselves confronted with a question that, if not carefully reviewed and adjudicated with the history and purposes of the RLA in mind, could serve to upset the precarious balance in labor

30

relations between unions and carriers and undermine the historical success of the RLA.

After Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co., 353 U.S. 30, 77 S. Ct. 635 (1957) ("Chicago River"), there exists an implied right of action under the RLA for unions and carriers to enforce its provisions through the courts. Specifically, Chicago River held that the district court "'has jurisdiction and power to issue necessary injunctive orders'" to enjoin strikes that were deemed illegal under the RLA. Id. at 42, 77 S. Ct. at 641 (quoting Bhd. of R.R. Trainmen v. Howard, 343 U.S. 768, 774, 72 S. Ct. 1022, 1025 (1952)).

There are two statutory bases by which CSXT alleged a violation of the RLA by BMWE and can maintain a private right of action. First, the fomentation of an illegal strike over a minor dispute violates the mandate that every minor dispute be subjected to compulsory arbitration under § 152, Second and § 153, First.[10] A union is prohibited from striking over a minor dispute. Chicago River,

_____

[10]Section 152, Second of the RLA states:

All disputes between a carrier or carriers and its or their employees shall be considered, and, if possible, decided, with all expedition, in conference between representatives designated and authorized so to confer, respectively, by the carrier or carriers and by the employees thereof interested in the dispute.

45 U.S.C. § 152, Second.

31

353 U.S. at 34, 77 S. Ct. at 637. Second, that BMWE instituted the strike without notice to CSXT of its intent to strike violates the duty to "exert every reasonable effort . . . to settle all disputes" under § 152, First.[11] The United States Court of Appeals for the Fifth Circuit recently articulated the identical proposition:

> BMWE's deliberate policy of repeatedly calling surprise strikes violates the statutory requirement that railroads and unions "exert every reasonable effort . . . to settle all disputes . . .in order to avoid any interruption to commerce." 45 U.S.C. § 152 First. A surprise strike makes it difficult or impossible to resolve the underlying dispute between labor and management without "interruption to commerce." Id. Because management

---

Section 153, First (i) of the RLA provides:

The disputes between an employee or group of employees and a carrier or carriers growing out of grievances or out of the interpretation or application of agreements concerning rates of pay, rules, or working conditions, . . . shall be handled in the usual manner up to and including the chief operating officer of the carrier designated to handle such disputes; but, failing to reach an adjustment in this manner, the disputes may be referred by petition of the parties or by either party to the appropriate division of the Adjustment Board with a full statement of the facts and all supporting data bearing upon the disputes.

Id. § 153, First (i).

[11]Section 152, First provides:

It shall be the duty of all carriers, their officers, agents, and employees to exert every reasonable effort to make and maintain agreements concerning rates of pay, rules, and working conditions, and to settle all disputes, whether arising out of the application of such agreement or otherwise, in order to avoid any interruption to commerce or to the operation of any carrier growing out of any dispute between the carrier and the employees thereof.

45 U.S.C. § 152, First.

32

is unaware that a strike is impending, it cannot take steps that might prevent it. In cases where the contemplated surprise strike is illegal under the RLA, the carrier cannot obtain an injunction against it until after the strike has begun and an "interruption to commerce" has already occurred.

Burlington N. & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Employees, 286 F.3d 803, 806 (5th Cir. 2002), cert. denied, — U.S. — , 123 S. Ct. 999 (2003). We agree. If a strike is imminent, regardless of whether it is over a major or minor dispute, it would seem incumbent upon the union to at least notify the carrier that the strike is impending. The form and timing of the notice is prescribed by the "every reasonable effort" language, which presumably requires that such notice will give the carrier adequate opportunity to seek an injunction from the district court, if appropriate to the facts of the dispute. 45 U.S.C. § 152, First. CSXT suggests that ten days is an appropriate time frame to constitute sufficient notice. While we decline to assign a bright temporal line applicable to the facts of every future dispute, we will acknowledge that, for most situations, a ten-day window to prevent an impending strike is manifestly "reasonable."

We conclude that BMWE violated both bases for liability under the RLA. First, although determinable in hindsight, BMWE illegally initiated a strike over two minor disputes - the inspector/supervisor repair dispute and the seniority dispute. Second, BMWE failed to provide CSXT with any notice, either formal or

33

informal, that a strike was impending over these disputes, thereby depriving CSXT of the opportunity to seek an injunction. Thus, BMWE purposefully abdicated its responsibility to exert "every reasonable effort" to avoid the strike, as required by the RLA. We note, as did the district judge for the United States District Court for Northern District of Texas, that BMWE's behavior is not unique to the case before us. See Burlington N. & Santa Fe Ry. Co., 143 F. Supp. 2d at 678-85 (citing not less than eighteen times in the prior seven years when BMWE at least threatened strike, nine times when the threat came into fruition, and not less than four instances in the prior year when BMWE planned a secret strike with the intent to implement it before the carrier could obtain an injunction).[12] It appears that in recent history, BMWE has imposed economic harm on carriers by exploiting, with impunity, this inherent loophole in the RLA; which, combined with the putative unavailability of remedial damages, permits the union to label any dispute as "major," secretly call a strike, and avoid any liability for the economic harm it imposes. BMWE conducted itself in a manner that violates the RLA, for which CSXT can maintain a private right of action.

---

[12] The district court in Burlington N. & Santa Fe Ry. granted plaintiffs' request for a permanent injunction and ordered BMWE to "provide at least ten days' notice to the affected plaintiff carrier prior to authorizing, encouraging, permitting, calling, or engaging in any strike, work stoppage, picketing, or other self help against such carrier . . . over any minor dispute or over any major dispute before the dispute resolution procedures prescribed by the RLA have been exhausted." 143 F. Supp. 2d at 696, aff'd, 286 F.3d 803 (5th Cir. 2002), cert. denied, — U.S. —, 123 S. Ct. 999 (2003).

The next issue is what remedies accompany an implied right of action for violation of RLA §§ 152, First and 153, First.

> [T]he question of what remedies are available under a statute that provides a private right of action is "analytically distinct" from the issue of whether such a right exists in the first place. . . . Thus, although we examine the text and history or a statute to determine whether Congress intended to create a right of action, we presume the availability of all appropriate remedies unless Congress has expressly indicated otherwise. . .
> The general rule, therefore, is that absent clear direction to the contrary by Congress, the federal courts have the power to award any appropriate relief in a cognizable cause of action brought pursuant to a federal statute.

Franklin, 503 U.S. at 65-66, 70-71, 112 S. Ct. at 1032, 1035 (internal citations omitted). In Franklin, the Supreme Court extended this longstanding jurisdictional rule to apply to instances when the right of action is implied and presumed that, because there was no indication otherwise, Congress enacted the statute from which a right of action is implied with this general rule in mind. Id. at 72, 112 S. Ct. at 1036 ("the same contextual approach used to justify an implied right of action more than amply demonstrates the lack of any legislative intent to abandon the traditional presumption in favor of all available remedies").

In Gebser v. Lago Vista Independent School District, 524 U.S. 274, 118 S. Ct. 1989 (1998), the Supreme Court elaborated on Franklin, which recognized the availability of damages in an implied right of action, and took the opportunity "to

35

delimit the circumstances in which a damages remedy should lie." Id. at 284, 118 S. Ct. at 1996. The Court acknowledged that the inquiry inherently involved some element of conjecture. Id. It applied the same approach to determining the scope of the implied right to determining the scope of the available remedies: "we generally examine the relevant statute to ensure that we do not fashion the scope . . . at odds with the statutory structure and purpose." Id. The general rule that all remedies are available "'yields where necessary to carry out the intent of Congress or to avoid frustrating the purposes of the statute involved.'" Id. at 285, 118 S. Ct. at 1996 (quoting Guardians Ass'n v. Civil Serv. Comm'n of New York City, 463 U.S. 582, 595, 103 S. Ct. 3221, 3228-29 (1983)). In Gebser, the Court considered to what extent damages were available in a Title IX implied action by "'attempt[ing] to infer how . . . Congress [at the time the statute was enacted] would have addressed the issue had the . . . action been included as an express provision in the statute.'" Id., 118 S. Ct. at 1997 (quoting Central Bank of Denver, N.A. v. First Interstate Bank of Denver, N.A., 511 U.S. 164, 178, 114 S. Ct. 1438, 1448 (1994)) (limiting the instances where damages were available to situations where those charged had actual notice of the discriminatory practices, in line with the basic objectives of the statute).

36

Section 152, First "was intended to be more than a mere statement of policy or exhortation to the parties; rather, it was designed to be a legal obligation, enforceable by whatever appropriate means might be developed on a case-by-case basis." Chicago & N.W. Ry. Co. v. United Transp. Union, 402 U.S. 570, 577, 91 S. Ct. 1731, 1735 (1971) ("United Transportation"). Given that CSXT can maintain a private right of action under the RLA § § 152, First and 153, First, it lies within our judicial power to fashion the appropriate remedy. Franklin, 503 U.S. at 65-66; 112 S. Ct. at 1032.

We are bound by our precedent in Louisville & Nashville Railroad Co. v. Brown, 252 F.2d 149 (5th Cir. 1958). In Brown, we held that:

> The Supreme Court has held that a major purpose of [the RLA] was to provide a machinery for settling railway labor disputes in a manner that would prevent or minimize strikes. That this was a purpose of the Act is not disputed. However, it does not follow that Congress has, by this announcement of policy, even though stated in the terms of "duty," intended to or succeeded in setting up a statutory right of action for damages for a breach of this duty. Where Congress sought to set up a right of action for damages for breach of duty in other management labor situations, it enacted a statute expressly spelling out the nature of the right of action. See 29 U.S.C.A. § 187, and so also in creating a right of action in the civil rights field. 42 U.S.C.A. § § 1983, 1985, 1986. We do not think that Congress here intended to or did create a new statutory right of action for damages of the nature declared upon by the plaintiff. . . .

37

Brown, 252 F.2d at 155 (recognizing, however, the right to injunctive relief pursuant to Chicago River) (first internal citation omitted). The Brown decision on this issue ostensibly regarded the availability of damages in other labor situations but not in the RLA as conclusive of Congress's intent. It buttressed this assumption by analogizing a cause of action for damages under 42 U.S.C. § 1983.

Intervening Supreme Court precedent, however, arguably belies this assumption and its blanket application to any and all claims for damages under the RLA § 152, First. Franklin, Gebser, and United Transportation, in the aggregate, give us sufficient cause to consider revisiting the issue and temper the far reaching effects of a broad precedent with overinclusive results. The aforementioned cases direct us to approach the issue of available remedies for implied private rights of action as a separate inquiry from the existence of the action itself, to do so in light of the underlying structure and purpose of the statute, and to make such determination on a "case-by-case" basis. Because Brown was decided many years prior to the development of a comprehensive scheme of implied rights of action and the assumption of availability of judicially crafted remedies in the absence of express Congressional mandate otherwise, its facial rejection of a damages remedy under RLA § 152, First has the effect of, at least here, depriving CSXT of any adequate remedy and undermines the purposes of the RLA.

Generally, a remedy at law is the preferred avenue of addressing parties' disputes and only if damages prove inadequate to address the wrong, will the equitable powers of the courts be tapped to fill the void. Franklin, 503 U.S. at 75-76, 112 S. Ct. at 1038. Under the RLA, however, in an effort to avoid the financial crippling of either party, injunctive relief is the favored vehicle for resolving labor disputes between parties when the structures of the RLA fail to do so. See Marquar, 980 F.2d at 380-81 (noting only four published cases in the history of the RLA approving the use of a damages remedy for RLA violations outside the context of breach of duty of fair representation). We accept that, on a general basis, injunctive relief is the first resort of courts when a union and carrier come before the court with an impending illegal strike threatening to disrupt carrier service. Nevertheless, as manifested by the situation of the parties before us, the law that damages are <u>never</u> available for violations of § 152,[13] although an accepted notion by other circuits, perpetuates an unscrupulous practice by unions

---

[13] We have not specifically decided whether damages are never available under § 153, which prohibits an illegal strike over a minor dispute; however, other courts have extended the <u>Brown</u> reasoning prohibiting damages under § 152 to decide just that. See <u>Norfolk S. Ry. Co. v. Bhd. of Locomotive Eng'rs</u>, 217 F.3d 181, 190-91 (4th Cir. 2000) (finding no damages remedy for illegal strikes); <u>Marquar</u>, 980 F.2d 359 (same); <u>Burlington N. R.R. Co. v. Bhd. Maint. of Way Employees</u>, 961 F.2d 86, 89 (5th Cir. 1992) (extending <u>Brown</u> to apply to § 153). It would be disingenuous to attempt to circumvent <u>Brown</u> and inconsistently permit an award damages for a violation of § 153, when the underlying reasoning in <u>Brown</u> inescapably translates to § 153 as well. Accordingly, we decline to develop incongruous law within our circuit and instead encourage our colleagues to address the issue in toto upon rehearing <u>en banc</u>.

39

that is antithetical to the purposes of the RLA. The unavailability of damages was considered to further the purposes of the RLA and in <u>Brown</u> we decided in congruence with that approach. Accordingly, CSXT may not recover damages against BMWE for the apparent violations of RLA §§ 152 and 153. Because injunctive relief was not a viable option for CSXT, it will remain a casualty of BMWE's exploitation of the RLA's shortcomings as currently interpreted in our circuit.

Were we writing on a clean slate, we would hold that, given the case-by-case determination of the appropriate remedies for an implied right of action as set forth in <u>Franklin</u> and its progeny, this case is the quintessential "appropriate" case for an action for damages under the RLA for violations of §§ 152 and 153.

In <u>Marquar</u>, Judge Batchelder filed an extensive dissent opposing the majority's broad categorical holding, which we regard as instructive on the inherent shortcomings of <u>Brown</u>. The dissent advocated a case-by-case determination whether a damages remedy was appropriate, and thought it necessary to remand the case to the district court to develop the factual record to make such a determination. The dissent was particularly perplexed about the potential that a party victimized by an intentional violation of the RLA would be left without recourse if damages were never available. <u>Marquar</u>, 980 F.2d at 374

40

("I am not prepared to say that an injunction, although an important remedy, will always be adequate to prevent and to compensate for illegal strikes by unions.") (Batchelder, J., dissenting). Judge Batchelder was unpersuaded that Congress should be left to decide at this juncture in the development of the RLA whether a damages remedy was available. Judge Batchelder read Franklin to presume the availability of all appropriate remedies, unless Congress expressly indicates otherwise, which it had not. Id. at 377 ("What is relevant is whether Congress explicitly rejected a damages remedy under the RLA, which it has not, and whether a damages remedy is appropriate, which I believe it is."). The dissent concluded that

> [t]he blanket statement that the majority makes - that damages are not available to a railway for a union's illegal strike - ignores the mandate that a panel of this Court set out in Kaschak [v. Consolidated Rail Corp., 707 F.2d 902, 906 (6th Cir. 1983)]: that the appropriateness of a remedy under the RLA must be determined on a case-by-case basis. Because this case is only at the motion to dismiss stage, I believe it is wrong to hold that the railway has failed to demonstrate why damages are appropriate in this fact situation. Therefore, I would reverse the district court's granting of the motion to dismiss and remand the case to the district court for further proceedings.

Id. at 379. We will not attempt to repeat Judge Batchelder's eloquent explication of the legislative history, purposes of the RLA, or policy arguments for the availability of damages under the RLA as appropriate; however, we enthusiastically endorse the reasoning.

41

As set forth, supra, the evolving jurisprudence of implied rights of action requires a case-by-case determination of the appropriate remedies, faithful to the structures and purposes of the statute as legislated by Congress. Congress clearly articulated the purposes of the RLA:

> (1) *To avoid any interruption to commerce or to the operation of any carrier engaged therein*; (2) to forbid any limitation upon freedom of association among employees or any denial, as a condition of employment or otherwise, of the right of employees to join a labor organization; (3) to provide for the complete independence of carriers and of employees in the matter of self-organization to carry out the purposes of this chapter; (4) to provide for the prompt and orderly settlement of all disputes concerning rates of pay, rules, or working conditions; (5) to provide for the prompt and orderly settlement of all disputes growing out of grievances or out of the interpretation or application of agreements covering rates of pay, rules, or working conditions.

45 U.S.C. § 151a (emphasis added). In addition, Congress did not provide for any means of enforcing the RLA,[14] which was later interpreted by Chicago River to create a private right of action to enforce it. Obviously then, Congress was silent as to the available remedies. Of particular moment, however, Congress remained silent after Franklin regarding the available remedies under the RLA; therefore, we are permitted to presume, until explicitly instructed otherwise, that all available remedies remain, subject to the constraints of appropriateness.

---

[14] There is only one criminal enforcement provision, which makes it a misdemeanor if a carrier does not follow certain requirements of § 152. See 45 U.S.C. § 152, Tenth.

42

The primary purpose of the RLA to settle disputes and avoid strikes and the interruption of commerce is, for the most part, adequately served by the preemptive remedy of injunctive relief. Given adequate notice of a union's impending strike over a purported major dispute, a disagreeing carrier who has implemented a disputed policy can seek the determination whether the dispute is major or minor and obtain an injunction if it becomes evident that the union is illegally initiating a strike over a minor dispute. When that notice is not given by the union, however, the possibility of obtaining an injunction before an interruption in commerce occurs is nonexistent. What recourse then does a carrier, victimized by economic force, have to vindicate its damages against an errant union? Conversely, what incentive does the union have to participate in settlement negotiations when it has the proverbial club to extort from the carrier the result it seeks; a club fashioned out of a risk-free semantic label of "major" rather than "minor"?

"It cannot be denied but that congress had the power to command that act to be done; and the power to enforce the performance of the act must rest somewhere, or it will present a case which has often been said to involve a monstrous absurdity in a well organized government, that there should be no remedy, although a clear and undeniable right should be shown to exist." Kendall v. United States ex rel. Stokes, 37 U.S. 524, 624, 12 Pet. 524 (1838); see Marbury v. Madison, 5 U.S. 137,

43

163 (1 Cranch 137, 163) (1803) ("'[I]t is a general and indisputable rule, that where there is a legal right, there is also a legal remedy by suit or action at law whenever that right is invaded'") (quoting 3 William Blackstone, Commentaries * 23).  Here, CSXT has a right vested by the RLA, yet Brown precludes the just remedy of compensatory damages for a surprise strike imposed by BMWE, who knew full well, based in measure on its prior use of this tactic, that a preemptive injunction was impossible and damages were not recoverable.  The result resonates of injustice.

While we recognize that there are valid arguments against the general availability of damages under the RLA, those arguments are inapposite here.  First, the primary argument against a damages remedy is that it would upset the balance of power so carefully maintained between the carriers and the unions.  See Marquar, 980 F.2d at 382.  We need not expound in further detail why this argument fails to pass muster here.  Rather, as manifested in the facts here, the unavailability of damages in the event that a union does not give notice of an authorized strike actually undermines the continued balance of power between the carrier and union.  Moreover, the animosity generated by use of such a tactic places the parties in postures less amenable to settlement.

The balance of power between a carrier and a union is maintained, even though damages would be available in this limited situation, because the union is in the power-position to decide whether it will give notice of the strike or not. If it does, the carrier would have its crack at the injunctive remedy, the preferred remedy, and the union would not be in any superior or inferior position as a result. The union would still be able to label a strike as major, argue the issue before the court if necessary, and seek self-help as it may for a carrier's failure to maintain status quo during a major dispute. The carrier, on the other hand, would be able to avoid the economic harm and interruption in service necessarily accompanying a strike, if it can present a viable case for injunctive relief. Otherwise, each party remains on par with regard to their relative bargaining positions and available remedies.

Hence, the chilling effect noted in Marquar, is non-existent. 980 F.2d at 382. Unions remain able to exercise their rights as available within the RLA because they still possess the right to strike over major disputes when status quo is not maintained; now the carrier merely has the ability to contest at the outset whether the dispute is major or minor. If the dispute is minor, it is illegal for the union to strike and it will be prevented from doing so.

Availability of damages in this case will not serve as an incentive to bypass the procedures of the RLA. Instead, the potential for damages if the union does not give notice will serve as an incentive for the parties to adhere to the RLA procedural requirements because it will not be to the benefit or detriment of either party to do otherwise. Removing this wild card will encourage the parties to bargain and negotiate within the structures of the RLA, as originally intended, and will relegate the courts to their appropriate and intended status of last resort.

## III. CONCLUSION

We hold, albeit reluctantly, that CSXT cannot maintain an action for damages under the RLA as mandated by the current law in our circuit. We urge our colleagues to reconsider the law en banc in light of the considerations outlined herein to reconcile the available remedies of the RLA with the purposes of the RLA and the interest of justice.

**AFFIRMED**.

BLACK, Circuit Judge, concurring specially:

I agree with the majority that the doctrine of collateral estoppel does not preclude us from deciding the issue of whether monetary damages are available under the RLA for an illegal strike. Furthermore, I agree with the majority that in *Louisville & Nashville Railroad Company v. Brown*, 252 F.2d 149 (5th Cir. 1958), we addressed this issue and answered it in the negative.[1] Thus, we are bound by our precedent to affirm the district court's ruling. All other issues are moot.

I specially concur with the result in this case because I respectfully disagree with the majority's call for the court to reconsider the *Brown* decision *en banc*. It is true that since *Brown* was decided the Supreme Court has clarified the framework for determining what remedies are available under a statute that provides a private right of action. *See Franklin v. Gwinnett County Pub. Sch.*, 503 U.S. 60, 112 S. Ct. 1028 (1992); *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 118 S. Ct. 1989 (1998). However, I do not think these precedents of relatively recent vintage present a sufficient reason to revisit *Brown*. I agree with the majority that were we writing on a clean slate and deciding this issue after *Franklin* and *Gebser*, we might find that monetary damages were appropriate

---

[1] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

under the RLA for violations of §§ 152 and 153. However, we are not writing on a clean slate.

The *Brown* court has already addressed this issue and resolved it. Parties have relied on this ruling for 45 years. In the 77-year history of the RLA, not one court of appeal has held that damages are an appropriate remedy in this situation. The three courts of appeals to address the issue since *Brown* have all followed *Brown*'s holding, noting that to recognize a monetary remedy at this late stage in the RLA's development would threaten to disrupt the balance that has developed between railroads and unions. *See Norfolk Southern Ry. Co. v. Bhd. of Locomotive Eng'rs*, 217 F.3d 181,190 (4th Cir. 2000) ("We are hesitant after all these years to do anything that might upset the delicate balance, particularly since the Act is structured to keep judicial involvement at a minimum."); *CSX Transp. v. Marquar*, 980 F.2d 359, 381-82 (6th Cir. 1992) ("After 66 years, a court should be reluctant to change the balance that has been struck between railroads and unions."); *See also Burlington Northern R.R. Co. v. Bhd. of Maint. of Way Employes*, 961 F.2d 86 (5th Cir. 1992).

Perhaps the majority is correct that BMWE is "exploiting, with impunity, this inherent loophole in the RLA" by repeatedly calling surprise strikes over minor disputes knowing that, under *Brown*, BMWE would not be liable for

48

monetary damages. (Opinion at 34.) Given BMWE's recent history of such practices, perhaps the balance of power between railroads and unions should be realigned to prevent unions from using surprise strikes as a "proverbial club to extort from the carrier the results it seeks."[2] (Opinion at 43.) This change in the law, however, should be accomplished by an act of Congress. *See Burlington Northern R.R. Co. v. Bhd. of Maint. of Way Employes*, 481 U.S. 429, 452-53, 107 S. Ct. 1841, 1855 (1987) (declining, "at this advanced stage of the RLA's development," to find a newly recognized limit on secondary picketing; reasoning that if Congress should now find that unions have abused their power, "it is for the Congress, and not the Courts, to strike the balance between the uncontrolled power of management and labor to further their respective interests.") (internal quotes and citations omitted).[3]

---

[2]In *Burlington Northern & Santa Fe Ry. Co. v. Bhd. of Maint. of Way Employes*, 286 F.3d 803, 808 (5th Cir. 2002), the Fifth Circuit described BMWE's deliberate policy of repeatedly calling illegal surprise strikes. *Id.* at 804-805, 808. The Fifth Circuit found BMWE's "long history of systemic abuse" justified a permanent, preemptive injunction requiring BMWE to give ten days' notice before initiating a strike against any of the carriers (which included CSXT). *Id.* at 808. Thus, if BMWE continues its practice of initiating illegal surprise strikes, it presumably will be subject to penalties for violating the injunction.

[3] The majority argues that since Congress remained silent on the issue of monetary remedies under the RLA after the Supreme Court's decision in *Franklin* (in which the Court found monetary remedies available under Title IX), we can presume that Congress intended monetary remedies to be available under the RLA. (Opinion at 42.) We might just as well presume from the congressional silence following *Brown*–and the three other court of appeals decisions finding monetary remedies not available under the RLA for an illegal strike–that Congress is content with the use of injunctive relief to enforce the RLA.

Principles underlying the doctrine of *stare decisis* outweigh any doubts I have about the correctness of the decision in *Brown*. "Adherence to precedent promotes stability, predictability, and respect for judicial authority." *Hilton v. South Carolina Public Ry. Comm'n.*, 502 U.S. 197, 202, 112 S. Ct. 560, 564 (1991). Additionally, "*stare decisis* is most compelling" where, as here, "a pure question of statutory construction" is involved. *Id.* at 205, 112 S. Ct. at 565. Therefore, I respectfully disagree with the majority's suggestion that the court take this case *en banc* and overrule *Brown*.